**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE LOUIS A. TELERICO | CASE NO. 17-50236 |
| *Debtor* | JUDGE ALAN M KOSCHIK |
| | CHAPTER 11 |

<u>DISCLOSURE STATEMENT VERSION 2.0 FOR LOUIS A. TELERICO</u>

## I.   INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the chapter 11 case of the Louis A. Telerico as Debtor and Debtor-in-Possession ("Debtor"). This Disclosure Statement has been prepared by the Debtor. This Disclosure Statement contains information about the Debtor and describes the Plan of Reorganization Version 2.0 of the Debtor Dated September 15, 2018 [Docket No.____] (the "Plan"). A full copy of the Plan is included with this Disclosure Statement.

***Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.***

**The proposed distributions under the Plan are discussed at sections III.B and III.D below of this Disclosure Statement. The Plan provides for two (4) classes of Secured Claims and one (1) classes of Unsecured Claims. General Unsecured Creditors holding Allowed Unsecured Claims in Class 5 are projected to receive distributions which the Debtor estimate to be eight to ten percent (8% to 10%) of their Allowed Claims.. Included with this Disclosure Statement is a ballot identifying in which Class of Claims your Claim has been Classified ("Ballot"). If you did not receive a Ballot, and you believe that you should have received a Ballot, please contact the Balloting Agent at the address included below.**

### A.   PURPOSE OF THIS DOCUMENT

This Disclosure Statement describes, among other things:

- The Debtor and significant events during this bankruptcy case ("Case")
- How the Plan proposes to treat Claims or equity interests of the type you hold (*i.e.*, what you will receive on your Claim or equity interest if the Plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why the Debtor believe the Plan is feasible, and how the treatment of your Claim or equity interest under the Plan compares to what you would receive on your Claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement, and discuss it with your counsel. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if

1

confirmed, establish your rights.  Terms defined in this Disclosure Statement, the Plan or 11 U.S.C. § 101 et seq. (the "Bankruptcy Code" or "Code") are capitalized herein.

### B. DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING; CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

#### 1. Time and Place of the Hearing to Confirm the Plan

The hearing at which the Court will determine whether to confirm the Plan will take place on _____, 2018, at ___:_____.M., in Judge Koschik's Courtroom 260, United States Bankruptcy Court, 2 S Main St, Akron, OH 44308.

#### 2. Deadline for Voting to Accept or Reject the Plan

If you are entitled to vote to accept or reject the Plan, vote on the enclosed Ballot and return the Ballot by (i) mailing it in the enclosed envelope; (ii) faxing it to the facsimile number located below; or (iii) e- mailing a scanned copy to the email address located below to **Frederic P. Schwieg, Esq. 2705 Gibson Dr., Rocky River OH 44116-3008 fax 440-398-0490 email: fschwieg@schwieglaw.com. Mr. Schwieg is also the "Balloting Agent".**

See section IV.A below for a discussion of voting eligibility requirements. Your Ballot must be received by _____, **2018 at 4 PM EDT** or it may not be counted.

#### 3. Disclaimer

***The Court has not yet approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.***

## II. BACKGROUND

### A. DESCRIPTION OF THE DEBTOR'S ASSETS AND LIABILITIES

The Debtor filed his Petition herein under Chapter 11 of the Bankruptcy Code on February 4, 2017 and has continued to operate as Debtor in Possession since that date.  No committee of unsecured creditors has been established in this case.

Aside from mortgages and tax liens on his residence, the vast majority of the Debt is owed for guarantees on loans to the Debtor's former businesses.

#### 1. Assets

##### a. Real Estate

Debtor is the Trustee of the Louis A. Telerico 2010 Amended and Restated Revocable Trust Indenture dated February 1, 2010 (hereinafter referred to along with the predecessor trusts described below as the "Trust").  The Trust amended and restated the Debtor's 2007 Amended and Restated Revocable Trust dated April 30, 2007, which itself amended and restated the Debtor's Elaine J. Telerico Revocable Trust dated November 4, 1992.  Under the 2010 Trust indenture all property of the prior trusts became property of the Trust.

The only significant assets titled in the Trust is a house and approximately 2 acres of land at 545 Bristol Dr., Aurora Ohio, identified by permanent parcel number 03-016-00-00-173-003

2

and used by the Debtor as his residence ("Home"), and three adjacent parcels of land one at 132 Bristol Drive, Aurora Ohio identified by permanent parcel number 03-016-00-00-177-000 ("Bristol Parcel") and Lot 130-A, 130-R, and 133 Glengarry Drive, Aurora, Ohio 44202 and identified by permanent parcel numbers 03-016-00-00-173-001 and 03-016-00-00-173-002 (collectively the "Glengarry Parcels" and with the Bristol Parcel the "Parcels" and both collectively with the Home, the "Real Estate").. (The Home occupies two lots, but they are not part of the Parcels). The Bristol Parcel and the smaller triangular lot on Glengarry abut the two lots on which the Home is situated. The other Glengarry Parcel is non-adjacent to the Home but does touch the other Glengarry Parcel. While the Real Estate was purchased within one year, the Home and the Parcels are not one integrated property, and the Parcels are separate buildable lots that were purchased as investment properties at the time they were placed into the Trust. The Home has an appraised value of $4,000,000.00. The Parcels were appraised collectively at $473,000.00. According to the appraisal the "highest and best use" for the Parcels is to be sold as separate buildable lots.

### 1) Description of the Home

As noted above the Home sits on 2.06 acres and is sited on the seventeenth hole of the Barrington Golf Course. The Home comprises 16,734 sq. ft. of living area above ground and another 11,375 sq. ft. below ground.

The rooms on the first :floor include the following: large two story great room, dining room, kitchen with eating/sitting area, library, laundry room, music room, two offices, mudroom, large master suite with sitting area, three walk-in closets and two master bathrooms, pet room, half bathroom. The second floor features numerous bedrooms, bathrooms, exercise room, loft area, overlooking master suite area and in-law suite with .kitchenette. There are two separate areas on the third level. These areas consist of a bedroom with, bathroom and walk-in closet and a tower office with 1/2 bathroom and sitting room. The basement area is partially finished with rec room and bar, exercise room; children's play room, wine cellar/billiard room, mechanical rooms and storage rooms. The front of the basement is below grade with the back area being exposed above grade with walkout.

Other features of the Home include the following: brick and stone exterior; slate roof, fourteen furnaces, central air; 16 to 17 course basement, 3,500 sq. ft. back stone terrace overlooking golf course; various balconies and patios; eight-car attached heated garage; seven bedrooms; eleven completed bathrooms; eleven fireplaces; one elevator; butler's pantry; second floor walkway overlooking great room; Lutron lighting system; central station fire alarm system; central station burglar alarm system;

While the overall condition of the Home is good, it remains unfinished inside and its great size and many complex mechanical systems require constant maintenance and repair. During this case the Debtor has spent approximately $4,500 per month on maintenance and repairs, and another $2,300 per month on utilities. The Debtor estimates that at a minimum the following repairs will have to be completed during the Plan Term:

| Home Repairs | | |
| --- | --- | --- |
| **Where** | **What** | **Estimate** |
| Attic | Insulation | $8,000.00 |
| Basement | Hot Water Tank | $2,400.00 |

3

| | | |
|---|---|---|
| Basement | Water Storage tank | $1,500.00 |
| Basement | Boiler | $3,750.00 |
| Basement | Furnace 1 | $2,350.00 |
| Basement | Furnace 2 | $4,200.00 |
| Basement | Plumbing | $2,200.00 |
| Basement | Waterproofing | $1,800.00 |
| Basement | Electrical | $7,400.00 |
| Basement | Drywall Electrical | $21,715.00 |
| Basement | Insulation | $5,800.00 |
| Basement | Gas Connection | $1,150.00 |
| Basement | Gas Venting | $475.00 |
| Basement | Windows | $2,200.00 |
| Basement | Weather Stripping | $2,200.00 |
| Basement | Caulking | $3,200.00 |
| Basement | Electric Code | $12,950.00 |
| Basement | Security/Fire Alarm | $7,950.00 |
| Basement | Electrical Install | $1,935.00 |
| Roof | Flat | $11,000.00 |
| Roof | Slate | $1,200.00 |
| Roof | Gutter | $2,775.00 |
| **TOTAL** | | **$108,150.00** |

These repairs have been included in the Debtor's projected expenses in Exhibit B.

Because of its size, location and unique qualities, the Debtor believes that finding an interested buyer willing to pay the appraised value of the Home is difficult and even unlikely. Under the Plan the Home will be retained by the Debtor and his spouse in return for paying the real estate taxes and the first mortgage as described below.

### b. Personal Property

On Schedule A/B the Debtor lists personal property consisting of household goods, sporting equipment, clothing and the like having a total value of $8,350; and two pensions: one from MetLife and one from Merrill Lynch having a combined value of $153,705. All of these assets are exempt from the estate under Ohio law (collectively the "Exempt Assets").

The Debtor also lists on his Schedule A/B some debts that are owed to him: Brian Zeid, $45,000.00 for non-payment of rent of $45,000.00; Tenora Edwards, Judgment for $32,908.00; William T Hunt rent due for 685 Hardwicke of $40,425.00; Mark Telerico (Son) personal loan of $30,000.00; Steve Penton (Son in law) personal loan of $10,000.00; Elaine Telerico (ex-wife) share of mortgage payments of $701,250.00; Elaine Telerico personal property share from divorce, $20,000.00. The Debtor lists other claims having an unknown value: Bank of America counterclaim; Stifel Nicolaus & Company, Incorporated ("Stifel") breach of employment agreement; Dollar Bank lender liability claim (collectively these are the "Debtor Claims") The Debtor releases all of his claims against Stifel under a settlement agreement (as discussed below) and he is uncertain of the actual amounts that may be collected on the

4

remaining Debtor Claims, but these remaining Debtor Claims will be transferred to the Creditor Trust (defined below) under the Plan.

## 2. Liabilities

The Portage County Treasurer has a real estate tax lien against the Home in the amount of $424,793.37 that is a first priority lien against the Home, a real estate tax lien against the Glengarry Parcels in the amount of $10,911.33 and $13,065.02 that is a first priority lien against them and a real estate tax lien against the Bristol Parcel in the amount of $4,051.89 that is a first priority lien against it.

On or about July 25, 2001 the Debtor executed a promissory note payable to Merrill Lynch Credit Corporation nka Bank of America ("BOA") in the principal amount of $3,000,000.00 ("BOA Note"). To secure repayment of the Note on or about the same date the Trust as mortgagor gave to BOA a mortgage interest in the House that is a second priority lien against it ("BOA Mortgage"). BOA filed proof of claim no. 11 in the Debtor's bankruptcy case asserting that $3,732,925.43 was owed on the BOA Note.

On or about December 4, 2009 the Debtor executed a promissory note payable to Stifel in the principal amount of up to $400,000.00 ("Stifel Note"). To secure repayment of the Note on or about the same date the Trust as mortgagor gave to Stifel a deed of trust granting it a mortgage interest in the Real Estate that is a second priority lien (only after real estate taxes) against the Parcels although a third priority mortgage against the House ("Stifel Mortgage"). Stifel filed proof of claim no. 20 in the Debtor's bankruptcy case asserting that $430,414.61 was owed on the Stifel Note.

The Debtor believes that the Stifel Note and Mortgage are undersecured against the Home as pursuant to 11 U.S.C. § 506, and therefore there is no value securing the Stifel Mortgage against the Home. While the Stifel Note and Mortgage is also secured by the Parcels, the Debtor believed that the balance owed Stifel was exceeded by amounts Stifel owed the Debtor, and Stifel is therefore an unsecured creditor of the estate.

Stifel did get a state court judgment holding that it has a second priority lien against the Parcels and a third priority lien against the Home. However, after this judgment, in 2013 the Debtor commenced an arbitration proceeding against Stifel and others with the Financial Industry regulatory Authority (FINRA) alleging fraud and breach of contract among other things. These claims include among other things taking of clients and failure to pay earned income to the Debtor. The face amount of the claims the Debtor believes to be in excess of $1,000,000 although the actual value of the claims is difficult to determine and has neither been liquidated nor pursued to this point. These matters are now part of the Motion to Compromise as explained in Section C.1 below.

The ODOT and IRS hold tax liens against the Debtor for unpaid income taxes. The IRS has filed a proof of claim for $498,750.74, of which it claims $448,817.10 is secured and $49,933.64 as non-priority and thus general unsecured claim. Arguably the Real Estate and the Debtor Claims are subject to the IRS lien as a federal tax lien extends to all real and personal property of the Debtor. The Debtor believes that there is no value securing the IRS claim as there are prior liens that exceed the value of the Real Estate, there is little to no value to the Debtor Claims and that all of the IRS Claim is a general unsecured claim in Class 4. The IRS claims are

5

not Priority Tax Claims as they arise from periods for which a tax return was last due more than three years prior to the Petition Date.

The Ohio Department of Taxation ("ODOT") filed a proof of claim for $79,688.04 as a Secured Claim, $73,076.71 of which (as filed) is claimed to be secured and the balance is a general unsecured claim in Class 4, with the sole exception of $3,100 for an estimated assessment by ODOT of Commercial Activity Tax ("CAT") for the year 2015. If allowed that amount might be a Priority Tax Claim as defined in the Plan and have to be paid within five years of the Petition Date. The Debtor believes that there is no value securing the ODOT claim, no basis for the assertion of CAT against him personally, and that all of the ODOT Claim is at best a general unsecured claim in Class 4.

Robert Ranallo and Dennis Gehrisch filed proof of claim no. 9 assert wherein they are owed $426,275.07 arising from the purchase of a note and judgment lien from Park View Federal Savings Bank (or its successor) as part of a settlement of their cross guarantee of that debt with the Debtor.

James Mirgliotta filed proof of claim no. 17 wherein he asserts he is owed $563,356.41 arising from the purchase of a note and two mortgage liens given to that bank by Capital L. Corp., a guarantee agreement with the Debtor and judgment lien from Fifth Third Bank (or its successor) against Capital L Corp and the Debtor. On May 15, 2018 the Bankruptcy Court approved the sale of real estate owned by Capital L Corp. As a result of that sale Mr. Mirgliotta will receive approximately $581,273.00 satisfying his claim in full. Therefore the Debtor no longer has any liability for proof of claim no. 17.

Dollar Bank filed proof of claim no. 18 wherein it asserts it is owed $1,751,754.93 arising from the Debtor's guarantee of certain obligations to Capital L Corp, T X Four Holdings LLC, Four Wells Ltd and other entities controlled by the Debtor.

First National Bank of Pennsylvania ("FNB") filed proof of claim no. 14 wherein it asserts it is owed $1,461,100.30 arising from the Debtor's guarantee of certain obligations to Capital L Corp, T X Four Holdings LLC, Four Wells Ltd and other entities controlled by the Debtor. On May 15, 2018 the Bankruptcy Court approved the sale of real estate owned by Capital L Corp on which FNB had a junior lien. As a result of that sale FNB received approximately $363,113 reducing its claim to approximately $1.1 Million.

There are other general unsecured claims filed against the estate but these are the major Claims against the estate.

## B. EVENTS LEADING TO CHAPTER 11 FILING

The Debtor was a senior vice president of investments with Merrill Lynch for many years earning substantial income. In 2001 the Debtor commenced building the Home using a $3.0 million construction loan from Merrill Lynch secured by a mortgage against the Home, as well as other personal funds. Construction of the Home took many years ultimately resulting in an occupancy permit in 2011. (There remain substantial uncompleted construction projects within the Home however). From the start of construction through the Debtor timely made all payments due on the BOA Note. In 2011 BOA refused to convert the construction loan to a home loan and demanded full payment of the balance due.

In addition the Debtor owned Capital L Corp, T X Four Holdings LLC, Four Wells Ltd and other entities controlled by the Debtor, most of which owned raw land in the City of Aurora

Ohio (collectively the "Companies"). Dollar Bank had most of the loans on the Companies' properties that were also secured by mortgages against their properties.

In 2005 the Debtor's ex-wife filed for divorce. An initial property settlement was reached and incorporated into a court order in April 2007. Under that agreement the Debtor borrowed $2.0 million from FNB secured by second mortgages on Companies' properties and a personal guarantee from the Debtor. These funds were used to pay the Debtor's settlement obligations to his ex-wife. Also under the separation agreement any income or gains from the sale of the Companies were to be split, but the Debtor's ex-wife's share was to be reduced to reimburse the Debtor for his advances to her pay one half of the monthly mortgage payments due Dollar Bank once the properties were sold. However if they had not been sold by April 2012, the Debtor's ex-wife was to commence paying her one-half of the mortgage payments due Dollar Bank. However the Debtor's ex-wife failed to pay that amount and instead commenced litigation over the divorce decree which finally terminated in 2013.

Further, as a result of the economic slowdown 2008, the market for the Companies' properties collapsed. The Debtor meanwhile had become employed at Stifel[1], December 14, 2009 and borrowed $400,000 against his future earnings and entered into the Stifel Note and Mortgage described above. The funds from the Stifel Note were used to fund construction on the Home and to pay ongoing obligations of the Debtor and the Companies.

The Debtor was terminated by Stifel in 2011. In 2013 the Debtor commenced an arbitration proceeding against Stifel and others with the Financial Industry Regulatory Authority (FINRA) alleging fraud and breach of contract among other things, and asserting that his claims exceeded the amount due on the Stifel Note (the "Arbitration").

Because of the general economic downturn and his ex-wife's failure to pay her half of the Companies debts, the Debtor could no longer afford the payments due on the Companies' and his own debts. Dollar Bank commenced litigation against the Companies and the Debtor to collect the amount due. Ultimately Capital L Corp, T X Four Holdings LLC, and Four Wells Ltd each filed their own Chapter 11 proceedings. Because of what the Debtor believes to have been overly hasty liquidation of the Companies' properties, the Debtor incurred substantial guarantee obligations to Dollar bank and FNB.

With the collapse of Merrill Lynch BOA acquired the BOA Note and Mortgage and commenced a foreclosure against the Home. Unable to reach a resolution with BOA and with a foreclosure sale set for February 5, 2017 the Debtor filed this bankruptcy case.

### C. THE DEBTOR FILES CHAPTER 11 AND POST-PETITION ACTIVITIES

After the filing the Debtor has continued to manage his affairs as Debtor-in-Possession. Because of the judgments against him at the time of the filing the Debtor could not take regular employment. Ultimately the Debtor became employed in June 2017 as an account executive with Combined Worksite Solutions (a Chubb Company). The Debtor is paid only on a commission basis.

---

[1] As a result of professional misconduct by the ex-wife's lawyer the Debtor's employment had been previously terminated with Merrill Lynch.

On June 28, 2017 the Court approved the retention of Daniel Miller, MAI, SRA, CVA to appraise the Real Estate. Mr. Miller provided the appraised values for the Real Estate used in this Disclosure Statement and the Plan.

The Debtor continued to seek a resolution with BOA and Stifel. Ultimately the Debtor filed an adversary proceeding styled *Louis A. Telerico, Debtor in Possession v. Portage Count Treasurer, et al.* Adv. No. 18-5008 ("Adversary"), in which he challenged the effectiveness of certain mortgages and tax and judgment liens against the Real Estate.

### 1. The Stifel Compromise and Sale of Glengarry 130A

On September 6, 2018 the Debtor filed his Motion of Louis A. Telerico Debtor and Debtor in Possession for Authority to Compromise Controversies with Stifel, Nicolas & Company, Inc. [Doc. 147] ("Motion to Compromise") and his Motion of Louis A. Telerico Debtor and Debtor in Possession to Sell a Parcel of Real Estate Free and Clear of All Liens, Claims and Encumbrances [Doc. 148] ("Motion to Sell").

In the Motion to Compromise the Debtor proposed compromising with Stifel for $125,000 as described in the proposed settlement agreement attached as Exhibit A to the Motion to Compromise. The proposed compromise will be paid from the net proceeds of sale of the Parcels, one of which is the subject of the Motion to Sell and other similar such motions to sell may be filed in the future. The Stifel liens will be released against (i) the Home upon approval of the proposed compromise and Stifel's receipt of 50% of the settlement payment; and (ii) the Parcels upon approval of the proposed compromise and Stifel's receipt of 100% of the settlement payment. In addition the Debtor and the estate will release Stifel from any and all claims, including but not limited to those raised in the Arbitration, and Stifel will be dismissed from the Adversary with prejudice pursuant to an agreed upon judgment in the form attached to the settlement agreement.

In return, Stifel will release the estate from any other claim other than the $125,000, the Stifel Mortgage will be avoided in its entirety against the Home (upon receipt of 50% of the settlement payment), and the Stifel Mortgage in excess of $125,000 against the Parcels will be avoided and preserved for the benefit of the estate pursuant to 11 U.S.C. §551 upon Stifel's receipt of 100% of the settlement payment.

In the Motion to Sell, the Debtor proposes to sell the Parcel at Glengarry 130A for $75,000 to his wife's son. After payment of the Real Estate Taxes on that parcel, the customary costs of sale, the remaining net proceeds will be paid to Stifel as partial funding of the Stifel compromise.

### D. PROJECTED RECOVERY OF AVOIDABLE TRANSFERS

The Debtor does not believe there are any significant prepetition transactions that constitute avoidance actions (i.e., preference actions or fraudulent transfers "Avoidance Actions") under Chapter 5 of the Bankruptcy Code, but these are transferred to the Creditor Trust under the Plan.

### E. CLAIMS OBJECTIONS

Except to the extent that a Claim is already Allowed pursuant to a final non-appealable order, the Debtor and the Creditor Trustee reserves the right to object to Claims. The Debtor and/or the Creditor Trustee shall file any objections to Claims within 90 days of the Effective

8

Date. Therefore, even if your Claim is Allowed for voting purposes, you may not be entitled to a Distribution if an objection to your Claim is later upheld. The procedures for resolving disputes to Claims are set forth in the Plan.

### F. CURRENT AND HISTORICAL FINANCIAL CONDITIONS

The identity and fair market value of the estate's assets on the date of filing as listed in on Exhibit A the comparative analysis of this Plan vs Chapter 7 liquidation, prepared by the Debtor, but using the appraised values for the House and the Parcels. The Debtor has prepared a projection of his future income and expenses set forth in Exhibit B. These documents are based on the Debtor's knowledge and experience. The projections are prepared on a cash basis of accounting, and the expenses are based on the Debtor's historical experience. The Debtor assumed a 5% growth in annual salary which is also based on his knowledge of the consulting industry, but there is no actual agreement to increase his salary by that amount.

The Summary of the Debtor's operating reports filed since the commencement of the Debtor's Case is attached as Exhibit C.

## III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. WHAT IS THE PURPOSE OF THE PLAN OF REORGANIZATION?

As required by the Code, the Plan places Claims and equity interests in various classes ("Class") and describes the treatment each Class will receive, a process known as "Classifying" or "Classification" of Claims (and the Claims so organized are called "Classified Claims"). The Plan also states whether each Class of Claims is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the consideration provided by the Plan. Amounts paid to various Creditors holding either Classified or Unclassified Claims are referred to as "Distributions."

### B. SUMMARY OF THE PLAN

#### 1. Classes of Claims in the Plan

The Plan creates four classes of Claims. All classes of Claims are impaired under the Plan and all holders of Allowed Claims are entitled to vote on the Plan. The amount paid on such Claim will depend on what the amounts of the Allowed Claims are, but with luck could be 10% of the Unsecured Claims in Class 5.

The first class is the Portage County Treasurer who has a real estate tax lien against the Home in the amount of $424,793.37 that is a first priority lien against the Home. This amount will be paid bearing no interest in 10 semiannual installments of $42,479.34 paid when the current real estate tax installment is on the Home. In addition the Debtor will also pay the current real estate taxes on the Home when due. The real estate tax lien against the Glengarry Parcels in the amount of $10,911.33 and $13,065.02 respectively that are first priority liens against them and a real estate tax lien against the Bristol Parcel in the amount of $4,051.89 will be paid in full when the Parcels are sold.

The second class is the BOA Note and Mortgage. The BOA Note will be converted to a new note having a 25 year term and bearing interest at the rate of 4% per annum. The Debtor will pay interest only in monthly installments for the first 60 months after the Effective Date on the new note, and amortizing amounts of principal and interest commencing in the 61st month

9

after the Effective Date. The Debtor shall have the right to prepay the BOA Note in full at any time without penalty.

The third class is the Stifel Note and Mortgage that are undersecured against the Home. As set forth above, the Debtor has reached an agreement with Stifel to Satisfy these claims for $125,000 paid from the Parcels.

The fourth class is the ODOT and IRS tax liens against the Debtor for unpaid income taxes. The IRS has filed a proof of claim for $498,750.74, of which it claims $448,817.10 is secured and $49,933.64 as non-priority and thus general unsecured claim in Class 5. Arguably the Real Estate and the Debtor Claims are subject to the IRS lien as a federal tax lien extends to all real and personal property of the Debtor. The Debtor believes that there is no value securing the IRS claim as there are prior liens that exceed the value of the Real Estate, there is little to no value to the Debtor Claims and that all of the IRS Claim is a general unsecured claim that will be paid prorata with Class 5. Nevertheless the IRS lien will be transferred to the proceeds of sale of the Trust Assets (that are prepetition assets of the estate), if any, subject to later determination by the Court or in accordance with a prior order of the Court or approved agreed judgment.

The Ohio Department of Taxation ("ODOT") filed a proof of claim for $79,688.04 as a Secured Claim, $73,076.71 of which (as filed) is claimed to be secured and the balance is a general unsecured claim in Class 5, with the sole exception of $3,100 for an estimated assessment by ODOT of Commercial Activity Tax ("CAT") for the year 2015. If allowed that amount might be a Priority Tax Claim as defined in the Plan and have to be paid within five years of the Petition Date. The Debtor believes that there is no value securing the ODOT claim, no basis for the assertion of CAT against him personally, and that all of the ODOT Claim is at best a general unsecured claim that will be paid pro-rata with Class 5. Nevertheless the ODOT lien will be transferred to the proceeds of sale of the Parcels subject to later determination by the Court

The fifth Class consists of the remaining balance due for Claims that were originally secured by the Debtor's Home or the Parcels other than Classes 1 ,2 and 3 and 4 and consists of all other unsecured Claims. The Debtor believes that there are 16 Creditors in Class 4: The gross amount of the Claims in Class 4 is $3,731,260.16 [IS THIS CORRECT? THIS NUMBER IS LESS THAN $4 MILLION?], but the Debtor believes some of those amounts to be overstated or payable from other sources. The Debtor believes there may only be $4,000,000 in claims in this class. Class 5 Claims will receive a pro-rata distribution with Class 4 if the lien of Class 4 is avoided only in part.

## 2. Means to Implement the Plan

On the Effective Date the Debtor will cause the Trust to transfer title to the Home to the Debtor and his wife Sharon Telerico free and clear of all liens claims and encumbrances EXCEPT for and subject to the real estate taxes owed the Portage County Treasurer, the BOA Mortgage, and the Stifel Mortgage. The Home shall remain subject to the Sitfel Mortgage until Stifel is paid 50% of the settlement amount in accordance with Class 3 and the settlement agreement reached between the parties. In addition to the assumption of the amounts due these three creditors, Sharon Telerico will make the contribution to plan funding set forth below.

The Debtor projects that his future income from all sources, social security, pension income, tax refunds and earned commissions and bonuses to be $300,000 annually. Up to 110% of this amount shall be the Debtor's "Base Future Income" and used to make payments to Class 1 and 2, the Debtor's living expenses and maintenance of the Home. Any amount in excess of

those amounts shall be paid to the Creditor Trust (defined below) as the "Net Income." If the Debtor earns income in excess of 110% of his Base Future Income (i.e $330,000) during the Plan Term, that amount shall be shared with the Creditor Trust with 2/3rds going to the Creditor Trust and 1/3rd being kept by the Debtor. The Creditor Trust's share shall be the "Debtor's Excess Income."

Sharon Telerico shall contribute $150,000 annually for each of the five years comprising the Plan Term, paid as funds are available, to pay the couple's living expenses, Class 1 and 2 Claims with any excess becoming part of and paid to the Creditor Trust as the "Net Income."

### 3. Creditor Trust

On the Effective Date the Debtor will create a trust for the benefit of Claims in Classes 3, 4, and 5 and the Trust Assets will be placed into that trust ("Creditor Trust"). The Creditor Trust will be managed by the Creditor Trustee. The assets to be transferred to the Creditor Trust (the "Trust Assets") shall include all assets of the Debtor as of the Petition Date other than the Home, and the Exempt Assets, but specifically including all Debtor Claims, Avoidance Actions, and the Debtor's Excess Income and Net Income.

On the Effective Date Harold A. Corzin shall become the trustee of the Creditor Trust (the "Creditor Trustee") Mr. Corzin has been selected to be the Creditor Trustee as he is a Chapter 7 panel trustee and familiar with the administration of bankruptcy estates. The specific powers of Mr. Corzin as Creditor Trustee are set forth in the Plan.

### C. POST-PETITION MANAGEMENT OF THE DEBTOR'S ESTATE.

The Creditor Trustee will have all authority to dispose, compromise or dispose of the assets in the Creditor Trust, and will also act as disbursing agent under the Plan, and will receive compensation for his services in making distributions under the Plan at the rate set forth in the Plan, other than the obligations assumed by the Debtor to the Portage County Treasurer and BOA..

### D. VESTING OF PROPERTY.

Subject to the further provisions of the Plan, on the Effective Date, all of the Debtor's assets other than the Home, all household goods and exempt assets, shall automatically vest in the Creditor Trust.

### E. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the Effective Date the Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed or before the date of the order confirming the Plan. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming the Plan.

### F. TAX CONSEQUENCES OF PLAN

**CREDITORS AND EQUITY INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.**

A summary description of certain United States federal income tax consequences of the Plan is provided below. This disclosure describes only the principal United States federal income tax

11

consequences of the Plan to the Debtor and to the Creditors who are entitled to vote to accept or reject the Plan. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. **No representations are being made to the Debtor or any Creditor regarding the particular tax consequences of the confirmation and consummation of the Plan.** No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any discussed in this disclosure.

The following discussion of United States federal income tax consequences is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to particular types of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees of a Debtor, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

Creditors are strongly urged to consult their own tax advisors regarding the United States federal, state, local, and foreign tax consequences of the transactions described in this Disclosure Statement and in the Plan.

### 1.   United States Federal Income Tax Consequences to the Debtor

The Debtor as an individual pays taxes on a cash income and expense basis. He believes that he will have sufficient business losses to offset any federal income tax liabilities during the plan term.

*Cancellation of Indebtedness Income.* Under the Plan, some of the Debtor' outstanding indebtedness will be satisfied in exchange for cash, and/or other property. The satisfaction of a Claim for an amount of cash and/or other property having a fair market value less than the "adjusted issue price" of the Claim generally would give rise to cancellation of indebtedness ("COD") income.

However, with the exception discussed below, the Debtor should not recognize COD income from the debt discharge under the Plan because the debt discharge will occur in a Title 11 bankruptcy case.

### 2.   Federal Income Tax Consequences to Creditors

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Plan to Creditors that are "United States holders," as defined below. The United States federal income tax consequences of the transactions contemplated by the

12

Plan to Creditors (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things: (l) whether the Claim and the consideration received in respect thereof are "securities" for federal income tax purposes; (2) the manner in which a Creditor acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current tax year or any prior tax year; (6) whether the Creditor has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the Creditor's method of tax accounting; and (8) whether the Claim is an installment obligation for federal income tax purposes. Creditors therefore should consult their own tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Creditor that is: (1) a citizen or individual resident of the United States; (2) a partnership or corporation created or organized in the United States or under the laws of the United States, a political subdivision thereof, or a State of the United States; (3) an estate the income of which is subject to United States federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

*Sale or Exchange of Claims.* Under the Plan, Creditors will receive cash in exchange for their Claims. A Creditor who receives such property in exchange for its Claim under the Plan will generally recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the fair market value of such shares and/or other property on the Effective Date, plus the amount of Cash received by such Creditor, and (2) the Creditor's adjusted tax basis in its Claim. A Creditor who recognizes a loss on a transaction conducted under the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.

*Accrued Interest.* Under the Plan, cash or other property may be distributed or deemed distributed to certain Creditors in respect of accrued interest on their Claims. Creditors that previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of cash or other property received with respect to such accrued interest on their Claims. Creditors that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that the Claim for accrued interest is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any property received in exchange for a Claim for accrued interest will equal the fair market value of such property on the Effective Date, and the holding period for the property will begin on the day after the Effective Date. It is not clear the extent to which consideration that may be distributed under the Plan will be allocable to interest. Creditors are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

*Other Creditors.* To the extent certain Creditors reach an agreement with the Debtor to have their Claims satisfied, settled, released, exchanged or otherwise discharged in a manner other than as described in the Plan, such Creditors should consult with their own tax advisors regarding the tax consequences of such satisfaction, settlement, release, exchange, or discharge.

13

*Non-Confidential Nature of the Tax Treatment and Tax Structure of the Plan.* A Creditor's disclosure of the tax treatment or the tax structure of the Plan is not limited in any manner by an express or implied understanding or agreement with or for the benefit of any person who makes or provides a statement, oral or written, to a Creditor (or for whose benefit a statement is made or provided to a Creditor) as to the potential tax consequences that may result from the Plan. Moreover, a Creditor's use or disclosure of information relating to the tax treatment or tax structure of the Plan is not limited in any other manner for the benefit of any person who makes or provides a statement, oral or written, to the Creditor (or for whose benefit a statement is made or provided to the Creditor) as to the potential tax consequences that may result from the Plan.

### 3. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Creditor's particular circumstances. Accordingly, Creditors are strongly urged to consult their tax advisors about the United States federal, state and local and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired Class of Claims must accept the Plan, without counting votes of Insiders; the Plan must distribute to each Creditor and equity interest holder at least as much as the Creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the Creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. WHO MAY VOTE OR OBJECT

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A Creditor or equity interest holder has a right to vote for or against the Plan only if that Creditor or equity interest holder has a Claim or equity interest that is both (1) an Allowed Claim or an Allowed Claim for voting purposes and (2) impaired.

In this case, the Classes the Debtor believes that are entitled to vote on the Plan are set forth in Article 3 of the Plan.

### 1. What Is an Allowed Claim or an Allowed Equity Interest?

Only a Creditor or equity interest holder with an Allowed Claim or an Allowed equity interest has the right to vote on the Plan. Generally, a Claim or equity interest is allowed if either (1) the Debtor has scheduled the Claim on the Debtor' schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated, or (2) the Creditor has filed a proof of Claim or equity interest, unless an objection has been filed to such proof of Claim or equity interest. When a Claim or equity interest is not allowed, the Creditor or equity interest holder holding the

14

Claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing objections to Claims will be ninety (90) days following the Effective Date of the Plan.***

### 2. What Is an Impaired Claim or Impaired Equity Interest?

As noted above, the holder of an Allowed Claim or equity interest has the right to vote only if it is in a Class that is *impaired* under the Plan. As provided in § 1124 of the Code, a Class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.

### 3. Who is Not Entitled to Vote

The holders of the following seven types of Claims and equity interests are *not* entitled to vote:

1. holders of Claims and equity interests that have been disallowed by an order of the Court;

2. holders of other Claims or equity interests that are not "Allowed Claims" or "Allowed Interests" (as discussed above), unless they have been "Allowed" for voting purposes.

3. holders of Claims or equity interests in unimpaired Classes;

4. holders of Claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

5. holders of Deposits;

6. holders of Claims or equity interests in Classes that do not receive or retain any value under the Plan; and

7. Holders of Administrative Expense Claims.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

### B. VOTES NECESSARY TO CONFIRM THE PLAN

If impaired Classes exist, the Court cannot confirm the Plan unless (i) at least one (1) impaired Class of Claims has accepted the Plan without counting the votes of any Insiders within that Class, and (ii) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting Classes, as discussed later in Section 3 below.

### 1. Votes Necessary for a Class to Accept the Plan

A Class of Claims accepts the Plan if both of the following occur: (i) the holders of more than one-half (1/2) of the Allowed Claims in the Class who actually vote, cast their votes to accept the Plan, and (ii) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan.

15

A Class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed equity interests in the Class, who vote, cast their votes to accept the Plan.

If no holder of a Claim or Equity Interest in a Class of Claims or Equity Interests eligible to vote in a particular Class timely submits a ballot to accept or reject the Plan and does not otherwise object to the Plan, then the applicable Class will be deemed to have voted to accept the Plan.

## 2. Treatment of Nonaccepting Classes

Even if one or more impaired Classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting Classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting Classes of Claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan.

## 3. Cramdown of the Plan

*Confirmation without Acceptance by All Impaired Classes.* Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired Classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired Class. With respect to the Plan, the Debtor intends to seek the application of the requirements set forth in Section 1129(b) of the Bankruptcy Code for Confirmation of the Plan in the event of a lack of acceptance by all impaired Classes. Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired Class to accept a plan of reorganization, the plan may be confirmed, on request of the plan proponent, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of impaired Claims or interests that has not accepted the plan. The condition that a plan be "fair and equitable" with respect to a rejecting Class of secured Claims includes the requirements that (a) the holders of such secured Claims retain the liens securing such Claims to the extent of the allowed amount of the Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the plan, and (b) each holder of a secured Claim in the Class receives deferred cash payments totaling at least the allowed amount of such Claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured Creditor's interest in the Debtor's property subject to the liens. The condition that a plan be "fair and equitable" with respect to a rejecting Class of Unsecured Claims includes the requirement that either (a) such Class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such Claim or (b) if the Class does not receive such amount, no Class junior to the non- accepting Class will receive a distribution under the plan.

The condition that a plan be "fair and equitable" with respect to a rejecting Class of equity interests includes the requirements that either (a) the plan provides that each holder of an equity interest in such Class receive or retain under the plan, on account of such equity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such equity interest, or (b) if

16

the Class does not receive such amount, no Class of equity interests junior to the rejecting Class will receive a distribution under the plan.

The Liquidation Analysis attached hereto as Exhibit A explains further why the Plan is fair and equitable.

***You should consult your own attorney if a "cramdown" confirmation will affect your Claim or equity interest, as the variations on this general rule are numerous and complex.***

### C. LIQUIDATION ANALYSIS

To confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the plan as such creditors and interest holders would receive in liquidation under Chapter 7 of the bankruptcy code. The Debtor believes that the Plan provides substantially more value to creditors than liquidation as set forth on Exhibit A

### D. FEASIBILITY

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

#### 1. Ability to Initially Fund Plan

The Debtor believes that he will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on such date from their funds on hand.

#### 2. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also show that the Debtor will have enough cash over the life of the Plan to make the required Plan payments. The Debtor has provided projected financial information. Those projections are listed in Exhibit B.

### E. RISK FACTORS

The proposed Plan has the following risks:

- The amount actually paid to Unsecured Creditors depends on the amount of the Claims actually allowed by the Bankruptcy Court.
- The Debtor's income may be different from that projected under the Plan, or his wife may not be able to pay the Spousal Contribution due under the Plan.
- The projected real estate taxes could increase on the Home.
- The Debtor's expenses could change or his income tax liability increase due to additional income.
- The Debtor or the Creditor Trustee may not be able to offset payment of the Stifel Note leaving the Stifel Mortgage in place on the Parcels in which case the proceeds generated for the sale of the Parcels will be used to pay the real estate taxes and the Stifel Mortgage in Class 3 and there will be little if anything for other creditors.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

17

## V. EFFECT OF CONFIRMATION OF PLAN

### A. DISCHARGE OF DEBTOR, INJUNCTION AND EXCULPATION

Discharge. Upon the final payment under the Plan, the Debtor may move the Court to grant him a discharge from any debt that arose before confirmation of the Plan, to the extent specified in §1141(d) of the Code.

Exculpation.  Neither the Debtor, or his professionals, attorneys accounts, agents, have or will incur any liability to any holder of a Claim or any other party in interest, or any of its' respective members or former members, agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of its' predecessors, successors, or assigns, for any act or omission in connection with, relating to, or arising out of, this Case, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan excluding acts and/or omissions of the Debtor under the Plan constituting gross negligence, bad faith, or willful misconduct, as finally determined by the Bankruptcy Court, and in all respects the Debtor, or any of its' respective officers, directors, professionals, attorneys accounts, agents, shareholders, partners, members, or employees are entitled to reasonably rely upon the advice of counsel with respect to its' duties and responsibilities under the Plan or in the context of the Case. Nothing in this Exculpation section is intended to waive any obligations of any party under the Plan.

### B. MODIFICATION OF PLAN

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new Disclosure Statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C. FINAL DECREE

As provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Court may designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion. Entry of a Final Decree shall not divest the Bankruptcy Court of jurisdiction over the Plan or any dispute arising from the Plan or any claims to be litigated by the Creditor Trust.

/s/ Frederic P. Schwieg

Frederic P. Schwieg, Esq. (0030418)
Attorney At Law
2705 Gibson Dr.
Rocky River, Ohio 44116-3008
(440) 499-4506
Fax (440) 398-0490
fschwieg@schwieglaw.com

By: /s/ Louis A. Telerico

    Louis A. Telerico

As to Spousal Contribution
/s/ Sharon Telerico

    Sharon Telerico

18

## VI.     INDEX OF EXHIBITS

Exhibit A   Liquidation Analysis

Exhibit B   Plan Financial Projection

Exhibit C   Summary of Operating Reports

## INDEX OF DEFINITIONS

Avoidance Actions, 6

Bankruptcy Code, 2

BOA, 3

BOA Mortgage, 3

BOA Note, 3

Bristol Parcel, 2

Case, 1

Class, 7

Classified Claims, 7

COD, 10

Code, 2

Court, 1

Creditor Trust, 8

Creditor Trustee, 8

Debtor, 1

Debtor Claims, 3

Debtor's Excess Income, 8

Disclosure Statement, 1

Exempt Assets, 3

FNB, 5

Glengarry Parcels, 3

Home, 2

IRS, 9

Net Income, 8

ODOT, 4

Parcels, 3

Plan, 1

Real Estate, 3

Stifel, 3

Stifel Mortgage, 3

Stifel Note, 3

Trust, 2

Trust Assets, 8

United States holder, 10

| Assets | | | Comments |
|---|---|---|---|
| Asset | Chapter 11 | Chapter 7 | |
| Home | $4,157,718.80 | $4,000,000.00 | In Chapter 11 the value for the Home is the sum of the real estate taxes and BOA Mortgage assumed by the Debtor and his wife. In Chapter 7 the Home is valued at its appraised value. |
| Parcels | $473,000.00 | $473,000.00 | |
| Debtor Net Income/Spouse Income | $50,110.23 | $0.00 | |
| Debtor Excess Income | unknown | $0.00 | |
| Debtor Claims/Avoidance Actions | $0.00 | $0.00 | |
| Exempt Assets | $0.00 | $0.00 | |
| TOTAL | $4,680,829.03 | $4,473,000.00 | |

| Payments on Claims | | | |
|---|---|---|---|
| Class 1 Portage County | | | |
| RE Tax on Home | $424,793.37 | $424,793.37 | |
| RE Tax on Parcels | $23,976.63 | $23,976.63 | |
| Class 2 BOA | | | In Chapter 11 the amount Consists of principal of $3,695,295 and interest @ 4% during Plan Term: total amount is much higher as includes interest for 25 year term. In Chapter 7 Debtor believes this amount will be far less as property will be abandoned in Chapter 7 and Home will be sold at sherriff's sale for perhaps 50% of FMV. |
| | $4,434,354.00 | $1,575,206.63 | |
| Class 3 Stifel | | | |
| From Home | $0.00 | $0.00 | |
| From Parcels | $125,000.00 | $125,000.00 | |
| Class 4 Secured Tax Claims | | | |
| From All Property | $0.00 | $0.00 | |
| Administrative Expenses | $39,155.51 | $0.00 | |
| Prioity Tax Claims | $0.00 | $0.00 | |
| Class 5 Unsecured Claims | | | |
| Total | $334,978.08 | $0.00 | |
| Percentage | 8% | 0.00% | |

**EXHIBIT A**

## Plan Cash Flow Projection from Debtor's Income

| Income Source | Income Provider | | Annualized | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Plan term |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Debtor | Spouse | | Debtor | Spouse | Debtor | Spouse | Debtor | Spouse | Debtor | Spouse | Debtor | Spouse | |
| SSA+Pension | $13,891.94 | | $166,703.28 | $166,703.28 | | $166,703.28 | | $166,703.28 | | $166,703.28 | | $166,703.28 | | $833,516.40 |
| Personal Earnings | $11,108.06 | $12,500.00 | $133,296.72 | $133,296.72 | $150,000.00 | $139,961.56 | $157,500.00 | $146,959.63 | $165,375.00 | $154,307.62 | $173,643.00 | $162,023.00 | $182,325.00 | $1,383,066.52 |
| Monthly Total | $25,000.00 | $12,500.00 | $300,000.00 | $300,000.00 | $150,000.00 | $306,664.84 | $157,500.00 | $313,662.91 | $165,375.00 | $321,010.90 | $173,643.00 | $328,726.28 | $182,325.00 | $2,216,582.92 |
| | | | | | | | | | | | | | | |
| Expenses | | | | | | | | | | | | | | |
| Household/Food/Clothing | $3,132.97 | | $37,595.64 | $37,595.64 | | $38,347.55 | | $39,114.50 | | $39,896.79 | | $40,694.73 | | $195,649.22 |
| Repairs Maintenance | $4,000.00 | | $48,000.00 | $48,000.00 | | $48,960.00 | | $49,939.20 | | $50,937.98 | | $51,956.74 | | $249,793.93 |
| Insurance | $1,500.00 | | $18,000.00 | $18,000.00 | | $18,360.00 | | $18,727.20 | | $19,101.74 | | $19,483.78 | | $93,672.72 |
| Medical | $887.49 | | $10,649.88 | $10,649.88 | | $10,862.88 | | $11,080.14 | | $11,301.74 | | $11,527.77 | | $55,422.40 |
| Utilities | $1,630.77 | | $19,569.24 | $19,569.24 | | $19,960.62 | | $20,359.84 | | $20,767.03 | | $21,182.37 | | $101,839.11 |
| Vehicles Expense | $1,747.47 | | $20,969.64 | $20,969.64 | | $21,389.03 | | $21,816.81 | | $22,253.15 | | $22,698.21 | | $109,126.85 |
| Business Expense | $1,398.21 | | $16,778.52 | $16,778.52 | | $17,114.09 | | $17,456.37 | | $17,805.50 | | $18,161.61 | | $87,316.09 |
| Net | $10,703.09 | | $128,437.08 | $128,437.08 | | $174,994.18 | | $178,494.06 | | $182,063.94 | | $185,705.22 | | $849,694.49 |
| Plan Payments | | | | | | | | | | | | | | |
| Sposal Contribution to Plan | | | | (Incl. in Ann. Amts) | | $150,000.00 | | $150,000.00 | | $150,000.00 | | $150,000.00 | | $750,000.00 |
| RE Tax | $11,486.54 | | $137,838.47 | $137,838.47 | | $137,838.47 | | $137,838.47 | | $137,838.47 | | $137,838.47 | | $689,192.37 |
| BOA | $11,465.70 | | $137,588.40 | $137,588.40 | | $137,588.40 | | $137,588.40 | | $137,588.40 | | $137,588.40 | | $687,942.00 |
| | | | | | | | | | | | | | | |
| Net to Trust | $250.85 | | $3,010.21 | $3,010.21 | | $6,243.78 | | $9,741.98 | | $13,520.08 | | $17,594.18 | | $50,110.23 |

NOTES

The Debtor has for the purpose of this projection assumed a modest 5% increase in his Personal Earnings, but not his SSA or Pension income.  He has projected expenses to increase at 2% per annum.



**EXHIBIT**

**B**

| | Month | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 |
| CASH-Beginning of Month | $1,250.00 | $10,739.26 | $12,926.04 | $11,373.01 | $10,983.59 | $12,761.77 | $21,029.48 | $12,255.91 | $17,113.41 |
| **CASH RECEIPTS** | | | | | | | | | |
| Salary or Cash from Business | | | | | $2,864.03 | | $4,621.52 | $7,088.79 | $5,157.75 |
| Wages from Other Sources (attach list to this report) | | | | $1,807.60 | | $1,895.55 | | | |
| Interest or Dividend Income | | | | | | | | | |
| Alimony or Child Support | | | | | | | | | |
| Social Security/Pension/Retirement | $13,693.84 | $13,891.94 | $13,891.94 | $13,891.94 | $13,891.94 | $13,891.94 | $13,891.94 | $13,891.94 | $13,891.94 |
| Sale of Household Assets (attach list to this report) | | | | | | | | | |
| Loans/Borrowing from Outside Sources (attach list to this report) | | | | | $29.72 | $72,832.23 | $878.58 | $4,390.56 | $84.73 |
| Other | | $50.00 | | $186.01 | | | | | |
| **TOTAL RECEIPTS** | $13,693.84 | $13,941.94 | $13,891.94 | $15,885.55 | $16,785.69 | $88,619.72 | $19,392.04 | $25,371.29 | $19,134.42 |
| **CASH DISBURSEMENTS** | | | | | | | | | |
| Alimony or Child Support Payments | | | | | | | | | |
| Charitable Contributions | | | | | | | | | |
| Gifts | | | | $129.45 | | | $281.31 | | $401.51 |
| Household Expenses/Food/Clothing | | $1,810.52 | $2,489.06 | $3,739.21 | $4,112.72 | $6,611.14 | $2,143.08 | $2,951.16 | $3,404.42 |
| Household Repairs & Maintenance | | $2,958.57 | $2,197.41 | $5,572.37 | $4,907.00 | $5,845.62 | $11,687.37 | $4,688.59 | $4,285.07 |
| Insurance | | $374.61 | $4,761.88 | $1,400.10 | $1,400.09 | $3,828.29 | $1,771.36 | $2,992.17 | $2,992.17 |
| IRA Contribution | | | | | | | | | |
| Lease/Rent Payments | | | | | | | | | |
| Medical/Dental Payments | | $328.53 | $73.78 | $190.38 | $104.58 | $224.27 | $168.54 | $453.56 | $234.99 |
| Mortgage Payment(s) | | | | | | | | | |
| Other Secured Payments | | | | | | | | | |
| Taxes - Personal Property | | | | | | | | | |
| Taxes - Real Estate | $2,215.20 | $370.00 | | | | $28,164.17 | | | |
| Taxes Other (attach schedule) | $1,250.00 | $1,250.00 | $1,250.00 | | | | | | |
| Travel & Entertainment | | | | $69.20 | $562.69 | | $727.16 | $235.56 | |
| Tuition/Education | | | | | | | | | |
| Utilities (Electric, Gas, Water, Cable, Sanitation) | $551.00 | $2,592.29 | $751.80 | $2,067.41 | $2,484.01 | $2,107.67 | $3,786.79 | $3,332.88 | $1,271.04 |
| Vehicle Expenses | | $1,246.00 | $1,360.86 | $2,642.40 | $1,297.72 | $1,530.72 | $1,981.21 | $1,327.29 | $2,975.72 |
| Vehicle Secured Payment(s) | | | | | | | | | |
| U. S. Trustee Quarterly Fees | | | | $325.00 | | | $975.84 | | $1,950.00 |
| Professional Fees (Legal, Accounting) | | | $933.33 | $39.95 | $138.70 | $3,244.95 | $890.21 | $114.95 | |
| Other (attach schedule) | $188.38 | $824.64 | $1,626.85 | $99.50 | | $28,795.18 | $3,752.74 | $4,417.63 | $5,757.84 |
| **Total Household Disbursements** | $4,204.58 | $11,755.16 | $15,444.97 | $16,274.97 | $15,007.51 | $80,352.01 | $28,165.61 | $20,513.79 | $23,272.76 |
| CASH - End of Month | $10,739.26 | $12,926.04 | $11,373.01 | $10,983.59 | $12,761.77 | $21,029.48 | $12,255.91 | $17,113.41 | $12,975.07 |

**EXHIBIT C**

| | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 |
|---|---|---|---|---|---|---|---|---|---|
| CASH-Beginning of Month | $12,975.07 | $12,560.25 | $11,367.97 | $12,788.73 | $11,818.02 | $11,514.91 | $8,423.58 | $12,089.18 | $13,326.99 |
| **CASH RECEIPTS** | | | | | | | | | |
| Salary or Cash from Business | $5,236.03 | $513.74 | $537.75 | $1,540.97 | $352.97 | $27.71 | | $186.49 | $720.73 |
| Wages from Other Sources (attach list to this report) | | | | | | | | | |
| Interest or Dividend Income | | | | | | | | | |
| Alimony or Child Support | | | | | | | | | |
| Social Security/Pension/Retirement | $13,891.94 | $13,891.94 | $13,922.94 | $13,922.94 | $13,922.94 | $13,922.94 | $13,922.94 | $13,922.94 | $13,922.94 |
| Sale of Household Assets (attach list to this report) | | | | | | | | | |
| Loans/Borrowing from Outside Sources (attach list to this repo | $565.29 | $2,173.90 | | $2,000.00 | | | | | |
| Other | | | | | | | $350.00 | $105.67 | $40,619.76 |
| **TOTAL RECEIPTS** | $19,693.26 | $16,579.58 | $14,460.69 | $17,463.91 | $14,275.91 | $13,950.65 | $14,272.94 | $14,215.10 | $55,263.43 |
| **CASH DISBURSEMENTS** | | | | | | | | | |
| Alimony or Child Support Payments | | | | | | | | | |
| Charitable Contributions | | | | | | | | | |
| Gifts | | | | | | | | | |
| Household Expenses/Food/Clothing | $4,239.90 | $3,132.97 | $3,290.10 | $2,228.74 | $1,684.56 | $2,047.05 | $1,761.78 | $2,471.83 | $2,518.39 |
| Household Repairs & Maintenance | $4,889.39 | $5,982.78 | $223.57 | $3,728.17 | $3,337.87 | $3,386.58 | $1,835.49 | $2,424.99 | $1,340.77 |
| Insurance | $2,992.17 | $2,992.17 | $3,453.15 | $2,992.17 | $2,806.18 | | $2,059.23 | $1,598.25 | $1,598.25 |
| IRA Contribution | | | | | | | | | |
| Lease/Rent Payments | | | | | | | | | |
| Medical/Dental Payments | $104.87 | $887.49 | $889.28 | $546.81 | $383.86 | $564.85 | $616.49 | $546.24 | $729.70 |
| Mortgage Payment(s) | | | | | | | | | |
| Other Secured Payments | | | | | | | | | |
| Taxes - Personal Property | | | | | | | | | |
| Taxes - Real Estate | | | | $4,000.00 | | | | | $47,099.03 |
| Taxes Other (attach schedule) | | | | | | | | | |
| Travel & Entertainment | | | | | | | | | |
| Tuition/Education | | | | | | | | | |
| Utilities (Electric, Gas, Water, Cable, Sanitation) | $1,786.07 | $1,630.77 | $2,156.62 | $2,034.43 | $3,436.90 | $5,037.80 | $1,717.25 | $3,831.26 | $1,014.86 |
| Vehicle Expenses | $1,793.51 | $1,747.47 | $1,390.84 | $1,768.97 | $1,750.01 | $1,827.77 | $1,244.32 | $1,800.71 | $1,799.35 |
| Vehicle Secured Payment(s) | | | | | | | | | |
| U. S. Trustee Quarterly Fees | | | | | | | $325.00 | | |
| Professional Fees (Legal, Accounting) | | | $1,000.00 | $74.95 | | $3,000.00 | | | |
| Other (attach schedule) | $4,302.17 | $1,398.21 | $636.37 | $1,060.38 | $1,179.64 | $1,177.93 | $1,047.78 | $304.01 | $101.72 |
| **Total Household Disbursements** | $20,108.08 | $17,771.86 | $13,039.93 | $18,434.62 | $14,579.02 | $17,041.98 | $10,607.34 | $12,977.29 | $56,202.07 |
| CASH - End of Month | $12,560.25 | $11,367.97 | $12,788.73 | $11,818.02 | $11,514.91 | $8,423.58 | $12,089.18 | $13,326.99 | $12,388.35 |

|  | Totals | Monthly Average |
|---|---|---|
| CASH-Beginning of Month | $217,297.17 | $12,072.07 |
| **CASH RECEIPTS** | | |
| Salary or Cash from Business | $28,848.48 | $2,404.04 |
| Wages from Other Sources (attach list to this report) | $3,703.15 | $1,851.58 |
| Interest or Dividend Income | $0.00 | $0.00 |
| Alimony or Child Support | $0.00 | $0.00 |
| Social Security/Pension/Retirement | $250,073.82 | $13,892.99 |
| Sale of Household Assets (attach list to this report) | $0.00 | $0.00 |
| Loans/Borrowing from Outside Sources (attach list to this repo | $82,955.01 | $10,369.38 |
| Other | $41,311.44 | $8,262.29 |
| **TOTAL RECEIPTS** | $406,891.90 | $22,605.11 |
| **CASH DISBURSEMENTS** | $0.00 | $0.00 |
| Alimony or Child Support Payments | $0.00 | $0.00 |
| Charitable Contributions | $0.00 | $0.00 |
| Gifts | $812.27 | $270.76 |
| Household Expenses/Food/Clothing | $50,636.63 | $2,978.63 |
| Household Repairs & Maintenance | $69,291.61 | $4,075.98 |
| Insurance | $40,012.24 | $2,500.77 |
| IRA Contribution | $0.00 | $0.00 |
| Lease/Rent Payments | $0.00 | $0.00 |
| Medical/Dental Payments | $7,048.22 | $414.60 |
| Mortgage Payment(s) | $0.00 | $0.00 |
| Other Secured Payments | $0.00 | $0.00 |
| Taxes - Personal Property | $0.00 | $0.00 |
| Taxes - Real Estate | $81,848.40 | $16,369.68 |
| Taxes Other (attach schedule) | $3,750.00 | $1,250.00 |
| Travel & Entertainment | $1,594.61 | $398.65 |
| Tuition/Education | $0.00 | $0.00 |
| Utilities (Electric, Gas, Water, Cable, Sanitation) | $41,590.85 | $2,310.60 |
| Vehicle Expenses | $29,484.87 | $1,734.40 |
| Vehicle Secured Payment(s) | $0.00 | $0.00 |
| U. S. Trustee Quarterly Fees | $3,575.84 | $893.96 |
| Professional Fees (Legal, Accounting) | $9,437.04 | $1,048.56 |
| Other (attach schedule) | $56,670.97 | $3,333.59 |
| **Total Household Disbursements** | $395,753.55 | $21,986.31 |
| CASH - End of Month | $228,435.52 | $12,690.86 |