**Exhibit A**

# FIXED/ADJUSTABLE RATE NOTE

LIBOR 6 Month Index (As Published in The Wall Street Journal)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE MAXIMUM RATE I MUST PAY.

| | | |
|---|---|---|
| July 25, 2001 | Cleveland | Ohio |
| | (City) | (State) |

555 Bristol Drive  Aurora, Ohio 44202

(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $3,000,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is Merrill Lynch Credit Corporation, a Delaware corporation with offices at 4802 Deer Lake Drive East, Jacksonville, Florida 32246-6484. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Adjustable Construction Interest Rate

Interest will be charged on unpaid principal until the full amount of principal has been paid. Until August 1, 2002, which is the date my permanent loan interest rate commences (the "Commencement Date"), I will pay interest on the principal balance outstanding from time to time at the adjustable interest rate set forth in paragraph 1 of the Addendum to Note Construction/Permanent Loans attached to this Note.

### (B) Calculation of the Initial Fixed Interest Rate

The Note Holder will calculate my initial fixed interest rate by adding one and one quarter percentage points (1.25%) to the Fixed Rate Index. The Fixed Rate Index is the Federal National Mortgage Association's required net yield for 30-year fixed rate mortgages subject to a 30-day mandatory delivery commitment, as published in *The Wall Street Journal* "Money Rates" table. If the Fixed Rate Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this change. The interest rate I will pay may change in accordance with Section 4 of this Note.

The current Fixed Rate Index is the most recent Fixed Rate Index figure available as of 2:00 p.m. Eastern time on the date that construction is actually completed (Actual Completion Date), as determined in accordance with the terms of the Construction Loan Agreement of even date. The Note Holder will round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my interest rate unless (i) I have established a different initial fixed interest rate under a lock agreement which has not expired; or (ii) as of the date the current Fixed Rate Index figure is identified, the initial fixed interest rate then being charged by Merrill Lynch Credit Corporation on comparable 360 months fixed/adjustable rate mortgage loans is less, in which event my interest rate will be equal to the lower Merrill Lynch Credit Corporation rate. In any event, my initial fixed interest rate will not exceed 18%.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**FIXED/ADJUSTABLE RATE NOTE-LIBOR INDEX-**SINGLE FAMILY-ARM NOTE CONSTRUCTION
ARM NOTE CONSTRUCTION (Interest Only) OH
(05-16-00) LARCOHIO (T)

*(page 1 of 5 pages)*





ORIGINAL

## 3. PAYMENTS

### (A) Time and Place of Payments

Beginning on the first day of September, 2002 and on the first day of every month thereafter until the first day of August, 2007, I will pay only the interest on the unpaid principal balance of the Note. Thereafter, I will pay principal and interest by making payments every month as provided below.

I will make my monthly principal and interest payments on the first day of each month beginning on September, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on August 1, 2032, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at 4802 Deer Lake Drive East, Jacksonville, Florida 32246-6484 or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

I will be notified by Note Holder of the amount of each of my monthly payments. This amount may change.

### (C) Withholding

If I am a non-resident alien, I understand that all payments due hereunder shall be paid without reduction for any taxes, deductions or withholding of any nature. If such tax, deduction or withholding is required by any law to be made from any payment to the Note Holder, I shall continue to pay this Note in accordance with the terms hereof, such that the Note Holder will receive such amount as it would have received had no such tax, deduction or withholding been required.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on August 1, 2007, and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on a different Index. This "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two percentage point(s) (2.00%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than my initial fixed interest rate plus six percent (06.0000%) and will not be less than my initial fixed interest rate minus six percent (06.0000%). My interest rate will never be greater than my initial fixed interest rate plus six percentage points (6%) or 13%, whichever is greater.

*(page 2 of 5 pages)*

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of: (i) my initial fixed interest rate; (ii) the change in my initial fixed interest rate to an adjustable interest rate; and (iii) any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my payment, any information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note and to pay the interest then accruing at the Note rate as of the date my prepayments are applied. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. Any partial prepayment made on or before the first Change Date may reduce the amount of my monthly payments. Any partial prepayment made after the first Change Date may reduce the amount of my monthly payments when the amount of such payments are determined at the next Change Date. However, any such reduction in my monthly payments may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit: and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.00% of my overdue payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.



### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.

The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, and a Mortgage 100^SM Pledge Agreement for Securities Account, if applicable, protects the Note Holder from possible losses that might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

### (A) UNTIL MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 17 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

*(page 4 of 5 pages)*

**(B) WHEN MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 17 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 17 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in the Security Instrument. Borrower will continue to be obligated under the Note and the Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE YOU SIGN IT.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
Louis A. Telerico
Borrower

_____(Seal)

Borrower

_____(Seal)

Borrower

_____(Seal)

Borrower

_____(Seal)

_____(Seal)

*(page 5 of 5 pages)*

# ADDENDUM TO NOTE
## CONSTRUCTION/PERMANENT LOANS

**THIS ADDENDUM TO NOTE** is made this 25th day of July, 2001, and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") to MERRILL LYNCH CREDIT CORPORATION (the "Lender"), and dated the same date as this Addendum (the "Note").

In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

1.     <u>Construction Interest Rate</u>. The proceeds of the loan evidenced by the Note are to be disbursed according to the terms of the Construction Loan Agreement of same date between Borrower and Lender. Notwithstanding the terms of the Note, until the Commencement Date (as defined in the Note) the annual interest rate on the outstanding principal balance outstanding at any time under the Note shall be equal to the sum of 00.00000% plus the Prime Rate. The "Prime Rate" is the highest prime rate published in <u>The Wall Street Journal</u> "Money Rates" table. The Prime Rate for any date on which <u>The Wall Street Journal</u> is not published shall be the Prime Rate in effect on the most recent date on which <u>The Wall Street Journal</u> was published. As of the date of this Addendum to Note, interest shall be paid at the rate of 6.75000% per annum. The interest rate may change on the first day of each month based on any change in the Prime Rate as of the last day of the preceding month. Until the Commencement Date, the interest rate will never be greater than 18% per annum. After the Commencement Date, the maximum interest rate will be as set forth in Section 2(B) and in Section 4(D) of the Note.

2.     <u>Payments During Construction Term</u>. Commencing on the first day of the month following the date hereof and continuing on the same day of each succeeding month thereafter, through and including the Commencement Date, Borrower shall make regular scheduled payments of interest only on the amounts disbursed and outstanding.

3.     <u>Loan Modification</u>. If the improvements described in the Construction Loan Agreement are completed before or after the Commencement Date, Lender may, at its option, move the Commencement Date to a date which is earlier or later than the date defined as such in the Note. In such event, Borrower agrees to enter into a loan modification agreement to effectuate the change in dates, payments or other matters, as applicable. Notwithstanding the foregoing, Lender may unilaterally move the Commencement Date, and Borrower agrees to be bound by the new Commencement Date in making payments.

Provided that no default exists under the terms of the Loan documents and that Borrower has first obtained Lender's prior written consent, which consent may be withheld by Lender in its absolute discretion, the date set for completion of construction may be extended on a one-time only basis for an additional period of up to six months. All the terms and conditions of this Addendum shall continue to apply during any such extension approved by Lender, except that all future interest rate changes which may occur through and including the extended Commencement Date shall be calculated by adding 00.00000% plus 0.25% to the Prime Rate. Borrower agrees to execute any additional documentation which Lender may request to confirm the extension.

4.     <u>Cross Default</u>. A default under the terms of the Construction Loan Agreement shall also constitute a default under the terms of the Note.

**BY SIGNING BELOW**, Borrower accepts and agrees to the terms and covenants contained in this Addendum to Note.

_____(Seal)
Louis A. Telerico
Borrower

_____(Seal)
Borrower

_____(Seal)
Borrower

_____(Seal)
Borrower

Addendum to Note Construction/Permanent Loans-5/1,7/1,10/1
(03/09/99) CNLAFADD

ORIGINAL

# Allonge to Mortgage Note

BofA loan number **Redacted**

Allonge to one certain Mortgage Note Dated: July 25, 2001

Executed By: Louis A. Telerico

Original Amount: **$3, 000, 000.00**

Property Address:

555 Bristol Drive Aurora, Ohio 44202

Pay to the Order of:

Without Recourse:
**BANK OF AMERICA, NATIONAL ASSOCIATION, SUCCESSOR BY MERGER TO MERRILL LYNCH CREDIT CORPORATION**

By: _____

Name: Jennie Stephens

Title: AVP

**ASSISTANT SECRETARY CERTIFICATE**
**OF**
**BANK OF AMERICA, NATIONAL ASSOCIATION**

The undersigned, Devra Lindgren, an Assistant Secretary of Bank of America, National Association (the "Association"), a national banking association organized and existing under the laws of the United States of America and having its principal place of business in the City of Charlotte, County of Mecklenburg, State of North Carolina, does hereby certify that:

1.  Effective July 1, 2011, **Merrill Lynch Credit Corporation** merged into and under the charter and title of **Bank of America, National Association**, Charlotte, North Carolina, Charter Number 13044.

IN WITNESS WHEREOF, I have hereupon set my hand and affixed the seal of said Association this 24th day of July, 2013.

[SEAL]

Devra Lindgren
Assistant Secretary


Redacted
Redacted



Exhibit B

_____[Space Above This Line For Recording Data]_____

MIDLAND TITLE SECURITY, INC.

Redacted

## OPEN-END MORTGAGE

THIS OPEN-END MORTGAGE ("Security Instrument") is given on July 25, 2001. The mortgagor is Louis A. Telerico, Trustee of the Elaine J. Telerico Trust, dated November 4, 1992 ("Borrower"). This Security Instrument is given to Merrill Lynch Credit Corporation and/or assigns, which is organized and existing under the laws of Delaware, and whose address is 4802 Deer Lake Drive East, Jacksonville, Florida 32246-6484 ("Lender"). Borrower owes Lender the principal sum of Three Million and 00/100------- Dollars (U.S. $3,000,000.00), which amount constitutes the maximum amount of unpaid loan indebtedness, exclusive of interest thereon, which is secured under this Security Instrument. This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on August 1, 2032. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note; and (d) the unpaid balances of loan advances made after this Security Instrument is delivered to the recorder for record. For this purpose, Borrower does hereby mortgage, grant and convey, with mortgage covenants (as defined in Section 5302.13 of the Ohio Revised Code), to Lender the following described property located in Portage County, Ohio:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

which has the address of 555 Bristol Drive , Aurora Ohio 44202 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS with Lender and/or its assigns, that Borrower is lawfully seized in fee simple of the granted Property; that the Property is free from all encumbrances; that Borrower has good right to sell and convey the same; and that Borrower does warrant and will defend the same to Lender and/or its assigns, forever, against the lawful claims and demands of all persons.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows
1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

OHIO-Single Family-Construction Mortgage                    **ORIGINAL**                    (page 1 of 7 pages)
(12/19/97) CNLOHMTG Ohio Mortgage

EXHIBIT
3

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C.@§ 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

*(page 2 of 7 pages)*

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

(Page 3 of 7 pages)



In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. **Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

*(page 4 of 7 pages)*

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all costs and disbursements incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, costs of title evidence.

22. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs but shall not be required to pay any other charges.

23. **Advances to Protect Security.** This Security Instrument shall secure the unpaid balance of advances made by Lender, with respect to the Property, for the payment of taxes, assessments, insurance premiums and costs incurred for the protection of the Property.

24. **Mechanic's Lien Statute.** Lender is hereby authorized to do all things provided to be done by a mortgagee under Section 1311.14 of the Mechanic's Lien Statute.

25. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

| | |
|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider |
| [ ] 1-4 Family Rider | [ ] Conversion Options Rider |
| [ ] Second Home Rider | [ ] Conversion Options / Periodic Rate Limits Rider |
| [ ] Index Conversion Option Rider | [ ] Adjustable Rate/Conversion Option Rider |
| [ ] Index Conversion Option / Periodic Rate Limits Rider | [ ] Adjustable Rate/ Index Conversion Option Rider |
| [ X ] Construction/Permanent Loan Rider | [ X ] Fixed/Adjustable Rate Rider |
| [ ] Other(s) [specify] | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it. If applicable, any Borrower's spouse who co-signs this Security Instrument, but does not execute the Note, has also executed this Security Instrument for the purpose of mortgaging and releasing (and does hereby so mortgage and release) all of such spouse's rights of dower in the Property.

BY SIGNING BELOW, the spouse of Borrower has also executed this instrument for the purpose of mortgaging and releasing (and does so mortgage and release) all of such spouse's rights of dower in the property.

Witnesses:

_____ (Seal)
TRUDI A. MINER                          -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
ROGER A. FRISMAN                        -Borrower

_____ (Seal)
                                        -Borrower

Louis A. Telerico, Trustee of the Elaine J. Telerico Trust, dated November 4, 1992

This instrument was prepared by:
**Merrill Lynch Credit Corporation**
**4802 Deer Lake Drive East**
**Jacksonville, Florida  32246-6484**

*(page 6 of 7 pages)*

_____[Space Below This Line For Acknowledgment]_____

STATE OF OHIO      )
                     ss:
COUNTY OF __CUYAHOGA_____)

    Before me, a __Notary Public_____ in and for said County and State, personally appeared the above-named __Louis A. Telerico, Trustee_____, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed.

    In Testimony Whereof, I have hereunto set my hand and official seal at ____Cleveland_____, Ohio, this __25th__ day of ___July_____, __2001__.

_____

ROBERT L. SHERMAN, Notary Public
State of Ohio, Cuyahoga County
My Commission Expires May 23, 2003

STATE OF OHIO      )
                     ss:
COUNTY OF Cuyahoga____)

    Before me, a __Notary Public_____ in and for said County and State, personally appeared the above-named _____, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed.

    In Testimony Whereof, I have hereunto set my hand and official seal at _____, Ohio, this _____ day of _____, _____.

_____

STATE OF OHIO      )
                     ss:
COUNTY OF _____)

    Before me, a _____ in and for said County and State, personally appeared the above-named _____, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed.

    In Testimony Whereof, I have hereunto set my hand and official seal at _____, Ohio, this _____ day of _____, _____.

_____

STATE OF OHIO      )
                     ss:
COUNTY OF _____)

    Before me, a _____ in and for said County and State, personally appeared the above-named _____, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed.

    In Testimony Whereof, I have hereunto set my hand and official seal at _____, Ohio, this _____ day of _____, _____.

_____

*(page 7 of 7 pages)*

**OPEN-END MORTGAGE**

Title No.

TO

Recorded At Request of
Merrill Lynch Credit Corporation

RETURN BY MAIL TO:

Merrill Lynch Credit Corporation
4802 Deer Lake Drive East
Jacksonville, Florida 32246-6484

Attention: Post Closing Department

RESERVE THIS SPACE FOR USE FOR RECORDING OFFICE

RECEIVED FOR RECORD
AT 5.26.37

200119914 25

PORTAGE CO. RECORDER
FEE 66.00

**INDEXED**

EXHIBIT "A"

The land referred to in this Commitment is described as follows:

Situated in the City of Aurora, County of Portage and State of Ohio: Being the consolidation of original Sublot Nos. 131 and 132 of Barrington Subdivision No. 2 recorded in Plat 94-74, an dnow known as Sublot 131-R, being part of Original Aurora Township Lot No. 16, as shown by the recorded Plat 94-87 of Portage County Records (The "Sublot" or "Sublots"), together with all rights created by the Master Declaration of Covenants, Conditions, Easements and Restrictions of Barrington, Aurora, Ohio recorded in Volume 1116, Pages 528 through 600 of Portage County Records.

## CONSTRUCTION/PERMANENT LOAN RIDER

**THIS CONSTRUCTION/PERMANENT LOAN RIDER**, dated July 25, 2001, is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to Merrill Lynch Credit Corporation (the "Lender") of the same date.

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. The Security Instrument secures advances made, and future advances to be made, pursuant to the terms of a Construction Loan Agreement between Borrower and Lender of the same date. A default under the terms of the Construction Loan Agreement shall also constitute a default under the terms of the Security Instrument. This Rider and the Construction Loan Agreement shall be deemed to be of no further force and effect on the earlier of the following dates:

(i) the date of satisfactory completion of construction of the improvements in accordance with the terms of the Construction Loan Agreement, or

(ii) July 31, 2002 (the "Scheduled Termination Date"), unless prior thereto either (a) a Notice of Trustee's Sale is recorded, (b) Lender files a lis pendens or an equivalent document as required to provide notice that Lender intends to judicially foreclose the lien of its Security Instrument or (c) Lender extends the maturity date of the Note by filing one or more notices in the official public records where the Security Instrument is recorded stating that this Rider remains in effect and stating a new Scheduled Termination Date after which this Rider shall no longer be deemed of any force and effect. It is understood and agreed that Lender may unilaterally extend the Scheduled Termination Date on one or more occasions without the joinder or consent of Borrower.

2. Lender shall not require Borrower to maintain an escrow account for the payment of yearly hazard or property insurance premiums as required by the Security Instrument until the earlier of the two dates specified in paragraph 1.

3. During the period of construction as set forth in the Construction Loan Agreement, the interest rate may change on the first day of each month and shall be equal to the sum of 00.00000% plus the highest prime rate published in The Wall Street Journal "Money Rates" table as of the last business day of the preceding month (the "Prime Rate"). During this period and until the earlier of the two dates specified in paragraph 1, the interest rate will never be greater than 18%. Thereafter, the maximum interest rate will be as set forth in paragraph 4(D) of the Adjustable Rate Rider or Fixed/Adjustable Rate Rider, as the case may be, attached to the Security Instrument.

4. Provided that no default exists under the terms of the Loan documents and that Borrower has first obtained Lender's prior written consent, which consent may be withheld by Lender in its absolute discretion, the date set for completion of construction may be extended on a one-time only basis for an additional period of up to six months. All the terms and conditions of the Note shall continue to apply during any such extension approved by Lender, except that all future interest rate changes which may occur through and including the extended Commencement Date shall be calculated by adding 00.00000% plus 0.25% to the Prime Rate. Borrower agrees to execute any additional documentation which Lender may request to confirm the extension.



**BY SIGNING BELOW,** Borrower(s) accepts and agrees to the terms and covenants contained in this Rider.

_____(Seal)      _____(Seal)
Borrower

                                                        Borrower

_____(Seal)      _____(Seal)
Borrower

                                                        Borrower

_____(Seal)
Louis A. Telerico, Trustee of the Elaine J. Telerico Trust, dated November 4, 1992

_____(Seal)

2

# FIXED/ADJUSTABLE RATE RIDER

LIBOR 6 Month Index (As Published in The Wall Street Journal)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 25th day of July, 2001 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to Merrill Lynch Credit Corporation, a Delaware corporation, whose street address is 4802 Deer Lake Drive East, Jacksonville, Florida 32246-6484, (the "Lender") of the same date and covering the property described in the Security Instrument and located at: 555 Bristol Drive Aurora, Ohio 44202.

THE NOTE PROVIDES FOR A CHANGE IN THE BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

Beginning with the Commencement Date (as that term is defined in the Note), the Note provides that Borrower will pay interest at an initial fixed rate equal to the margin described in the Note plus the current Fixed Rate Index figure. The Fixed Rate Index is the Federal National Mortgage Association's required net yield for 30year fixed rate mortgages subject to a 30-day mandatory delivery commitment, as published in The Wall Street Journal "Money Rates" table. The Note also provides for a change in the initial fixed interest rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on August 1, 2007, and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

CTP LIBOR ARM Rider ST

Redacted (TM)

(page 1 of 4 pages)

**(C) Calculation of Changes**

Before each Change Date the Note Holder will calculate my new interest rate by adding two percentage points (2.00%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the next Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits of Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than my initial fixed interest rate plus six percent (06.0000%) and will not be less than my initial fixed interest rate minus six percent (06.0000%). My interest rate will never be greater than my initial fixed interest rate plus six percentage points (6%) or 13%, whichever is greater.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of the change in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

    **1. UNTIL BORROWER'S INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 17 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:**

        **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument.

        If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

(page 2 of 4 pages)



**2. WHEN BORROWER'S INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 17 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 17 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of the Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in the Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in the Security Instrument. Borrower will continue to be obligated under the Note and the Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**



**BY SIGNING BELOW**, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____(Seal)    _____(Seal)
Borrower                                        Borrower

_____(Seal)    _____(Seal)
Borrower                                        Borrower

_____(Seal)
Louis A. Telerico, Trustee of the Elaine J. Telerico Trust, dated November 4, 1992

_____(Seal)

(page 4 of 4 pages)

Exhibit C

# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"MERRILL LYNCH CREDIT CORPORATION", A DELAWARE CORPORATION, WITH AND INTO "BANK OF AMERICA, NATIONAL ASSOCIATION" UNDER THE NAME OF "BANK OF AMERICA, NATIONAL ASSOCIATION", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE COUNTRY OF UNITED STATES, AS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-NINTH DAY OF JUNE, A.D. 2011, AT 1:41 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE FIRST DAY OF JULY, A.D. 2011, AT 12:01 O'CLOCK A.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 8876508

DATE: 06-30-11

5005109  8100M

110775899

You may verify this certificate online
at corp.delaware.gov/authver.shtml

EXHIBIT

2

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 01:41 PM 06/29/2011*
*FILED 01:41 PM 06/29/2011*
*SRV 110775899 - 0928866 FILE*

## CERTIFICATE OF MERGER

### OF

### MERRILL LYNCH CREDIT CORPORATION

### INTO

### BANK OF AMERICA, NATIONAL ASSOCIATION

Pursuant to Section 252 of the General Corporation Law of the State of Delaware, the undersigned Bank of America, National Association, hereby certifies that:

(1) The name and state of incorporation of each of the constituent corporations are:

    (a) Merrill Lynch Credit Corporation, a Delaware corporation; and

    (b) Bank of America, National Association, a national banking association organized and existing under the laws of the United States.

(2) A Plan and Agreement of Merger, dated May 19, 2011, between Merrill Lynch Credit Corporation and Bank of America, National Association, (the "Merger Agreement") has been approved, adopted, certified, executed and acknowledged by Merrill Lynch Credit Corporation and by Bank of America, National Association, in accordance with the provisions of subsection (c) of Section 252 of the General Corporation Law of the State of Delaware.

(3) The name of the surviving corporation is Bank of America, National Association.

(4) This Certificate of Merger is effective as of July 1, 2011, a t 12:01 a.m., Eastern Time.

(5) The Amended and Restated Articles of Association of Bank of America, National Association, Charter Number 13044, shall be the articles of association of the surviving corporation.

(6) The executed Merger Agreement is on file at the principal place of business of the surviving corporation. The address of the principal place of business of the surviving corporation is 101 S. Tryon Street, Charlotte, North Carolina 28255.

(7) A copy of the agreement of merger will be furnished by the surviving corporation, on request and without cost, to any stockholder of Merrill Lynch Credit Corporation or of Bank of America, National Association.

(8) Bank of America, National Association, hereby agrees that it may be served with process in the State of Delaware in any proceeding for enforcement of any obligation of Merrill Lynch Credit Corporation, as well as for enforcement of any obligation of the surviving corporation arising from the merger, including any suit or other proceeding to enforce the right of any stockholders as determined in appraisal proceedings pursuant to 8 Del. C. §262, and Bank of America, National Association, hereby irrevocably appoints the Secretary of State of the State of Delaware as its agent to accept service of process in any such suit or other proceedings and a copy of such process shall be mailed by the Secretary of State of the State of Delaware to Bank of America, National Association, at the following address:

Bank of America, National Association
101 S. Tryon Street
Charlotte, North Carolina 28255

IN WITNESS WHEREOF, Bank of America, National Association, has caused this certificate to be signed by its duly authorized officer, on the ___29th___ day of _____June_____, 2011.

Bank of America, National Association

BY: _Holly H. Mruz_____
Name: Holly H. Mruz
Title: Vice President

**EXHIBIT D**
**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| In re: | : |  |
|---|---|---|
|  | : |  |
| **Louis Anthony Telerico** | : | **Case No.: 17-50236** |
|  | : | **Chapter 11** |
| **Debtor(s).** | : | **Judge Alan M. Koschik** |
|  | : |  |
|  | : | **BANK OF AMERICA, N.A.'S RELIEF** |
|  | : | **FROM STAY WORKSHEET** |
|  | : |  |

I.    LOAN DATA

A.    IDENTIFICATION OF COLLATERAL (check all that apply):

☒    Real Estate 545 Bristol Drive, Aurora, OH 44202
☐        Principal Residence of Debtor(s)
☒        Other

☐    Personal Property <Describe.  Include ID or VIN number, as applicable>
☐    Other Property <Describe> _____

B.    CURRENT VALUE OF COLLATERAL: $2,481,000.00 _____

C.    SOURCE OF COLLATERAL VALUATION:  the 2017 Portage County Auditor's tax record

D.    ORIGINAL LENDER: Merrill Lynch Credit Corporation _____

E.    ENTITY ENTITLED TO ENFORCE THE NOTE: Bank of America, N.A. _____

F.    CURRENT LOAN SERVICER: Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP

G.    DATE OF LOAN: July 25, 2001 _____

H.    ORIGINAL PRINCIPAL AMOUNT DUE UNDER NOTE: $3,000,000.00 _____

I.    ORIGINAL INTEREST RATE ON NOTE: 6.750% _____

J.    CURRENT INTEREST RATE:  5.500% _____

K.    ORIGINAL MONTHLY PAYMENT AMOUNT
(principal and interest only for mortgage loans):  $0.00 _____

L.    CURRENT MONTHLY PAYMENT AMOUNT: $12,945.14 _____

17-029909_EJS1

M.      THE CURRENT MONTHLY PAYMENT AMOUNT LISTED ABOVE:

☐      Includes an escrow amount of $_____ for real estate taxes.
☐      Includes an escrow amount of $_____ for property insurance.
☐      Includes an escrow amount of $_____
☒      Does not include any escrow amount.

N.      DATE LAST PAYMENT RECEIVED:  3/1/2011

O.      AMOUNT OF LAST PAYMENT RECEIVED: $8,054.75

P.      AMOUNT HELD IN SUSPENSE ACCOUNT:  $0.00

Q.      NUMBER OF PAYMENTS PAST DUE:  89

II.     AMOUNT ALLEGED TO BE DUE AS OF **OCTOBER 9, 2018**

|     | Description of Charge | Total Amount of Charges | Number of Charges Incurred | Dates Charges Incurred |
| --- | --- | --- | --- | --- |
| A. | PRINCIPAL | $2,999,985.00 | | |
| B. | INTEREST | $854,338.04 | | |
| C. | TAXES | $0.00 The amount provided in this Line C. represents the sum of taxes and insurance due as of October 9, 2018 | | |
| D. | INSURANCE | See Note to Line C above. | | |
| E. | LATE FEES | $0.00 | | |
| | | $0.00 | | |

17-029909_EJS1

| | | | | |
|---|---|---|---|---|
| F. | NON-SUFFICIENT FUNDS FEES | | | |
| G. | PAY-BY-PHONE FEES | $0.00 | | |
| H. | BROKER PRICE OPINIONS | $0.00 | | |
| I. | FORCE-PLACED INSURANCE | $0.00 | | |
| J. | PROPERTY INSPECTIONS | $0.00 | | |
| K. | OTHER CHARGES | | | |

TOTAL DEBT: $3,854,323.04*

LESS AMOUNT HELD IN SUSPENSE: $0.00

TOTAL DUE AS OF DATE MOTION IS FILED: $3,854,323.04*
* This total cannot be relied upon as a payoff quotation.

III.  AMOUNT OF ORIGINAL PRE-PETITION ARREARAGES $732,940.45.

IV.  AMOUNT OF ALLEGED POST-PETITION DEFAULT

| | Description of Charge | Amount | Number | Date Incurred | Total |
|---|---|---|---|---|---|
| A. | PAYMENTS | $9,205.43 | 1 | March 2017 - March 2017 | $9,205.43 |
| | | $10,191.73 | 1 | April 2017 - April 2017 | $10,191.73 |
| | | $10,479.40 | 1 | May 2017 - May 2017 | $10,479.40 |
| | | $10,828.71 | 1 | June | $10,828.71 |

17-029909_EJS1

| | | | | | |
|---|---|---|---|---|---|
| | | | | 2017 - June 2017 | |
| | | $10,479.40 | 1 | July 2017 - July 2017 | $10,479.40 |
| | | $11,465.70 | 1 | August 2017 - August 2017 | $11,465.70 |
| | | $11,465.70 | 1 | September 2017 - September 2017 | $11,465.70 |
| | | $11,095.83 | 1 | October 2017 - October 2017 | $11,095.83 |
| | | $11,465.70 | 1 | November 2017 - November 2017 | $11,465.70 |
| | | $11,095.83 | 1 | December 2017 - December 2017 | $11,095.83 |
| | | $11,465.70 | 1 | January 2018 - January 2018 | $11,465.70 |
| | | $12,102.68 | 1 | February 2018 - February 2018 | $12,102.68 |
| | | $10,931.45 | 1 | March 2018 - March | $10,931.45 |

17-029909_EJS1

| | | | | 2018 | |
|---|---|---|---|---|---|
| | | $12,102.68 | 1 | April 2018 - April 2018 | $12,102.68 |
| | | $12,328.71 | 1 | May 2018 - May 2018 | $12,328.71 |
| | | $12,739.66 | 1 | June 2018 - June 2018 | $12,739.66 |
| | | $12,328.71 | 1 | July 2018 - July 2018 | $12,328.71 |
| | | $13,376.65 | 2 | August 2018 - September 2018 | $26,753.30 |
| B. | POST-PETITION PAYMENTS ADVANCED FOR TAXES (if not included in payment amount above)[*] | $0.00 | | | $0.00 |
| C. | POST-PETITION PAYMENTS ADVANCED FOR INSURANCE (if not included in payment amount above) | $0.00 | | | $0.00 |
| D. | LATE FEES | $0.00 | | | $0.00 |
| E. | NON-SUFFICIENT FUNDS FEES | $0.00 | | | $0.00 |

17-029909_EJS1

| | | | | | |
|---|---|---|---|---|---|
| F. | PAY-BY-PHONE FEES | $0.00 | | | $0.00 |
| G. | BROKER PRICE OPINIONS | $0.00 | | | $0.00 |
| H. | FORCE-PLACED INSURANCE | $0.00 | | | $0.00 |
| I. | PROPERTY INSPECTIONS | $0.00 | | | $0.00 |
| J. | OTHER CHARGES | $0.00 | | | $0.00 |

TOTAL ACCRUED:          $218,526.32

LESS SUSPENSE BALANCE:     $0.00

TOTAL POST-PETITION DEBT:     $218,526.32

**V.    Debtor has made no post-petition payments so no payment history is attached.**

This Worksheet was prepared by:

/s/Stephen R. Franks
Stephen R. Franks (0075345)
Edward H. Cahill (0088985)
Adam B. Hall (0088234)
John R. Cummins (0036811)
Karina Velter (94781)
Sarah E. Barngrover (28840-64)
Manley Deas Kochalski LLC
P.O. Box 165028
Columbus, OH 43216-5028
Telephone: 614-220-5611
Fax: 614-627-8181
Attorneys for Movant
The case attorney for this file is Stephen R. Franks.
Contact email is srfranks@manleydeas.com

17-029909_EJS1